**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**


| | |
|---|---|
| UNITED STATES OF AMERICA, | * 4:08-cr-00252-IPJ-PWG |
| | * |
| | * |
| Plaintiff, | * March 24, 2009 |
| | * |
| vs. | * 9:00 a.m. |
| | * |
| MARTIN TRACY McBURNETTE, | * Birmingham, Alabama |
| | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE INGE P. JOHNSON**
**UNITED STATES DISTRICT JUDGE**


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


For the Plaintiff:          Daniel J. Fortune, Esq.
                            Laura D. Hodge, Esq.
                            United States Attorney's Office
                            1801 4th Avenue North
                            Birmingham, Alabama 35203-2101


For the Defendant:          Michael V. Rasmussen, Esq.
                            Attorney at Law
                            130 Inverness Plaza, Ste. 175
                            Birmingham, Alabama 35242


Court Reporter:             Leah Sharp Turner, CSR, RMR, CRR
                            Federal Official Court Reporter
                            1729 5th Avenue North, Suite 325
                            Birmingham, Alabama 35203

*2*

1           This cause came to be heard and was heard on the
24th day of March 2009 before the Honorable Inge P.
2    Johnson, United States District Court Judge, holding court
for the Northern District of Alabama.
3

4           Proceedings continued as follows:

5                     (COURT CALLED TO ORDER.)

6           THE COURT:  This is cr-08-252, the United States

7    vs. Martin Tracy McBurnette.  Let the record show

8    Mr. McBurnette is present with his attorney, Michael

9    Rasmussen; and Daniel Fortune and Laura Hodge are here from

10   the U.S. Attorney's Office.  Kim Franklin is here from U.S.

11   probation.

12           I would like for the record to reflect this is

13   the day set for sentencing of Mr. McBurnette.

14   Mr. Rasmussen, have you and your client had 35 days in

15   which to review the presentence report?

16           MR. RASMUSSEN:  We have, Your Honor.

17           THE COURT:  Before we actually go to sentencing,

18   is there a stipulation with respect to -- or is there an

19   agreement with respect to the restitution?

20           MR. RASMUSSEN:  Yes, Your Honor.  We have agreed

21   that in lieu of restitution and forfeiture Mr. McBurnette

22   will deed over the property that is the subject of the

23   forfeiture -- that is, the property on Rocky Ford Road --

24   to the child victim, and that is a binding agreement.  He

25   will personally affirm that agreement if you wish.

*3*

1           THE COURT:  That is in lieu of restitution?

2           MR. RASMUSSEN:  And forfeiture, Your Honor.

3           THE COURT:  I assume the forfeiture count is then

4     going to be dismissed once the deed is signed?

5           MR. RASMUSSEN:  Yes, Your Honor.

6           MR. FORTUNE:  That's correct, Your Honor.  The

7     Government would just ask that the Court in regards to the

8     forfeiture matter continue the sentencing as to that issue

9     just so the Court reserves jurisdiction over the forfeiture

10    matter.

11          THE COURT:  I just need to know -- and I know

12    Mr. Donald Ray is here on behalf of Mrs. McBurnette,

13    Mr. McBurnette's mother.  She filed yesterday withdrawing

14    her claim of title and interest in and to the property

15    sought to be forfeited by the Government?

16          MR. RAY:  Yes, ma'am.

17          THE COURT:  But I think if there is going to be

18    deeds issued voluntarily, she either needs to satisfy the

19    mortgage or issue a quitclaim deed.  Would that quitclaim

20    deed be to the minor child?

21          MR. RAY:  It will be to [redacted], and I expect

22    I will be preparing both instruments.  There will be a

23    warranty deed from Martin Tracy McBurnette to [redacted],

24    and it will also be from Linda Lou Frix McBurnette.  She is

25    not married.  It will be also a quitclaim deed to

*4*

1   [redacted].

2           THE COURT:  That will be fine, and I will be glad

3   to withhold my jurisdiction with respect to the forfeiture

4   until such time as the parties inform that the deeds have

5   been signed and the property has been transferred.

6           Thank you so much, Mr. Ray.  You may leave.  You

7   are excused.

8           I have read the presentence report, and I know

9   there are some objections.  Actually, I have read

10  everything.  I have read a letter from Brenda Chapman, the

11  minor child's mother, that I got today.  I have read a

12  report and a CV for Nancy Aldridge, Ph.D,. who apparently

13  did a psychological evaluation of the defendant.  I have

14  obviously read the presentence report, the objections filed

15  by the defendant, the sentencing memo filed by Mr. Fortune,

16  and letters.  I guess we should go to the objections first.

17          The first objection is the defendant's objection

18  to paragraph No. 7.  Do you wish to say anything else about

19  that?

20          MR. RASMUSSEN:  Your Honor, I believe that we

21  have agreed to have that amended.

22          THE COURT:  I should say that the record should

23  reflect that we met in chambers prior to the hearing here

24  in open court, and the parties have agreed that the

25  statements made by the minor female at the interview on

5

1    November 7, 2007, regarding whether or not there was

2    penetration should be included in the presentence report,

3    and paragraph 7 should be amended to reflect that rather

4    than what is in paragraph 7.  Am I correct, Mr. Fortune?

5    Ms. Hodge?

6            MR. FORTUNE:  Yes, Your Honor.  Within the

7    defendant's psychosexual evaluation report, in the

8    paragraph it basically begins -- the Government would ask

9    that it reflect using that language where it begins she

10   stated that Tracy touched her privates.

11           THE COURT:  That's what I plan, and I will give

12   you a copy of it so you will have it.  Let the record show

13   that paragraph 7 of the presentence report is so amended.

14           The next objection is objection No. 2 to

15   paragraph 12.  The defendant objects to not receiving an

16   adjustment for acceptance of responsibility.  Do you want

17   to argue that?

18           MR. RASMUSSEN:  I do, Your Honor.  Your Honor,

19   one of the responses by the probation officer concerned

20   whether or not -- what were the reasons for going to trial

21   whether or not it would preserve any issues.  It had

22   nothing to do with guilt or innocence.  And there were

23   motions regarding the unconstitutionality as applied to

24   this defendant.  That doesn't necessarily go to the merits

25   of the case.  So we did file a motion to dismiss on that

*6*

1    count.

2         We also filed a motion to dismiss on the form of

3    the indictment, which also has nothing to do with the

4    acceptance of guilt or responsibility.  I would also note

5    that with regard to preserving issues that you should be

6    allowed to raise on appeal, in the Government's plea

7    agreements the Government specifically requires a defendant

8    to waive any sentencing issues.  That has nothing to do

9    with guilt or innocence.  That just has to do with

10   sentencing.  So we did have reasons for -- we were

11   preserving our rights, rights which had nothing to do with

12   the merits of the case or nothing to do with what he did or

13   didn't do.

14        The probation officer also says that we required

15   the victim to testify.  We did not require the victim to

16   testify.  Even by going to trial, we did not require the

17   victim to testify.

18        With regard to Count 1, the only issue was

19   whether or not the materials that were used to make the

20   movie were produced in interstate commerce.  The child's

21   testimony had nothing, added nothing to that whatsoever.

22   The only thing that her testimony was relevant to was

23   Count 2 in which he was found not guilty.  He shouldn't be

24   punished for not accepting responsibility for something the

25   jury found he didn't do.

*7*

1          So I think the comment that the defendant

2     required the victim to testify should be a nonfactor in

3     this case.

4          Furthermore, Your Honor, there are other reasons

5     that have to do with why we went to trial.  It had to do

6     with the state case that was pending -- why we didn't

7     plead.  If we would have pled, that would have impacted the

8     state case, and the state case hadn't been resolved.  I

9     will say more about that later on.  The fact is that there

10    are many reasons why it went to trial.  It had nothing to

11    do with not accepting responsibility.  The defendant

12    accepts responsibility for what he did to this child, and

13    he should be given credit for acceptance of responsibility.

14         THE COURT:  Why are you saying that he accepted

15    responsibility aside from what the probation officer wrote?

16         MR. RASMUSSEN:  He admitted what he did to this

17    child.  He admitted what he did to this child.  Now, as to

18    interstate commerce, he doesn't know.  He admitted what he

19    knows.  He admitted what he did.

20         THE COURT:  Anything from you, Mr. Fortune?

21         MR. FORTUNE:  Your Honor, once again the

22    defendant did not make any sort of a prompt admission into

23    what he did or did not do with the child.  In fact, at the

24    time -- which was clear from the motion hearing as well as

25    present at trial -- when officers were at his residence

*8*

1    clearly looking for child pornography, he did not admit

2    what he did.  He did not tell them everything that he did.

3    He actually didn't indicate whether he had -- when he

4    actually was called to testify at the motion hearing and I

5    directly asked him, you knew what was on those tapes that

6    were found up there, his response was I didn't know what

7    they were going to find up there.

8           And we have no statements, no statements that he

9    made to any law enforcement officers where he admitted to

10   what he did to the child, which is what he was convicted

11   for of Count 1.

12          Although the jury found him not guilty of

13   Count 2, the Government did not receive any admission from

14   this defendant as to Count 1 or as to Count 2, and we were

15   required to present testimony of the victim.  One, she had

16   to identify herself in regard to Count 1.  She also had to

17   talk about the use of the Internet and the use of the

18   computer by this defendant.  So he definitely should not

19   receive the third point, nor should he receive the first

20   two points for acceptance of responsibility.

21          When they executed the search warrants, he didn't

22   admit to that; and then even through motion hearings, there

23   was no admissions on behalf of the defendant as to his

24   acceptance of responsibility, absolutely none.

25          MR. RASMUSSEN:  If I may briefly respond, Your

9

1    Honor, there is no requirement that acceptance of
2    responsibility be fixed at the first time he has contact
3    with law enforcement.  The question is:  Does he now accept
4    responsibility for what he did?  He does now accept
5    responsibility for what he did, and before trial and during
6    trial he accepted responsibility for what he did.
7            THE COURT:  I cannot agree with you,
8    Mr. Rasmussen.  You all have given me this most interesting
9    forensic psychosexual evaluation.  I assume I was supposed
10   to read it since it was submitted to me.  I think it's most
11   interesting that your client, Mr. McBurnette, told the
12   doctor as follows on page 8 at the bottom:  "He" -- that
13   means Mr. McBurnette -- "stated the abuse of the child did
14   not occur because he was aroused by children.  He abused a
15   child because he felt he could get away with it.  Again he
16   reiterated it was not that he wanted to have sexual contact
17   with the child.  He wanted to have sex, and she was there.
18   He does not lust after children.  He tricked the child into
19   having sexual contact with him.  It was not the child he
20   was interested in.  It was the sexual experience."
21           So that's what he says now when he was visited by
22   the good doctor on March 4, 2009, two weeks ago.  So he is
23   saying he was not actually interested in hurting the child.
24   He just did that because she was there and he could get
25   away with it.  However, regardless of what is said by

**10**

1   anybody so far about this issue including what is in the

2   probation officer's response, he had on his computer and he

3   is charged with and was convicted of sexual exploitation of

4   a child.  He had the URL search terms and Web sites

5   containing words such as "preteen Lolitas, little kids

6   f-u-c-k-i-n-g, first CP, CP loving, CP paradise, little

7   bitch, 10-year-old sex pics," and all the other things that

8   were testified to.  Without me having to say all of that on

9   the record, it's spelled out in the Government's brief on

10  page 11 as to what he had and looked up on his computer,

11  which certainly does not indicate that he was only

12  interested in sex and he just used the child because she

13  was there.  He was specifically looking up child

14  pornography on his computer.  At least he had those Web

15  sites and search terms.

16          And I also would like to say from the

17  psychological evaluation on page 8, he says, "How can a

18  person who is basically so good, how could that person do

19  something so horrible?"

20          He is still questions and apparently thinks he is

21  so good and questions how could he do that, and that

22  doesn't show to me that he has accepted responsibility.

23  I'm going to overrule that objection.

24          MR. RASMUSSEN:  Your Honor --

25          THE COURT:  I have overruled that objection.  We

*11*

1    are going to go to the next.

2            MR. RASMUSSEN:  I understand.

3            THE COURT:  I gave you a chance to say anything

4    you wanted to.  The next objection is paragraph 17.  The

5    defendant objects to the quote otherwise in the care,

6    custody, and supervisory control of the defendant.  That is

7    the enhancement or the extra 2 points for 2(g)(2.1)(B)(5).

8    Do you want to say anything else about that?

9            MR. RASMUSSEN:  Your Honor --

10           THE COURT:  And I will have to say the objections

11   were very limited.  I don't have the benefit of your

12   conversations with probation and the Government.  You say

13   in your objection that you have -- and I'll have to read

14   it.  You say here, "Due to the sensitive nature of this

15   case, the defendant has made more particular objections to

16   the paragraphs and communications made directly to the

17   probation office and the Government," and I'm not privy to

18   those.  I just have your written objections.

19           MR. RASMUSSEN:  Yes.

20           THE COURT:  So I'm just going by what I have, and

21   the next one I have is to paragraph 17.

22           MR. RASMUSSEN:  With respect to whether he is in

23   custody, Your Honor, I did e-mail some materials and more

24   information of our position to the probation office and the

25   Government.  I don't have a copy of that e-mail.

*12*

1          THE COURT:  Neither do I.

2          MR. RASMUSSEN:  But I would add these two facts

3    or point out these two facts:  She didn't go up there to

4    see the defendant.  She didn't go up there to be taken care

5    of by the defendant.  She went up there to see her dog.

6    And when she told him she didn't want to do it anymore, she

7    didn't go up there anymore.  And those are two factors

8    which tend to indicate that she was not in his custody.

9          THE COURT:  Anything from the Government?

10          MR. FORTUNE:  Your Honor, the child was 7 1/2 or

11    8 years old at the time of the victimization.  She

12    initially began going when she was 7.  She is a longtime

13    friend of the family.  A 7-year-old going to the neighbor's

14    house is in the control of an adult.  And at this time, it

15    was a trusted adult, a friend of the family.

16          You even saw that in the video.  There were times

17    when he controlled her.  He told her where to sit, told her

18    what to do, what not to do and then sent her home.  When

19    the parents wanted her home, they called this defendant

20    because this defendant had control of that 7-year-old to

21    send her.  Even though temporary, for limited purpose, et

22    cetera, she was 7 1/2 years old.  He was watching her when

23    she was at his house playing with her dog that he now had

24    custody of, Your Honor.

25          We believe that that enhancement should apply as

**13**

1    further enumerated in our response filed as document 70 in

2    the record on page 12 of that document.

3          THE COURT:  Anything else?

4          MR. RASMUSSEN:  No, Your Honor.

5          THE COURT:  I have read United States vs.

6    Jennings that the probation officer cites in the response,

7    and it's dated June 3, 2008.  It's 280 -- I mean page 836,

8    Eleventh Circuit.  I don't find it particularly helpful

9    because it's not really an analogous situation, but I will

10    have to say that I'm going to overrule this objection for

11    several reasons.

12          First of all, he had physical control over her.

13    She was sitting in a chair in his trailer blindfolded, and

14    I remember from seeing the videotape during the trial that

15    particularly when he had ejaculated into her mouth and she

16    wanted to spit it out, her blindfold was coming off and she

17    wanted -- she acted like she was starting to pull it off,

18    and he pushed it back.  Then she asked for something to

19    spit it out in.  He handed her a towel, and again the

20    blindfold was adjusted by him when she --

21          MR. RASMUSSEN:  Your Honor --

22          THE COURT:  I'm not finished.

23          MR. RASMUSSEN:  I'm sorry.  I just don't know if

24    we need to put that in the record.

25          THE COURT:  Well, I have to make my record, and

*14*

1   I'm making it.  She didn't get to get up.  She didn't get

2   to take her blindfold off.  Then she is obviously not --

3   she is very uncomfortable.  Let me put it that way.  And he

4   says, "We are not through yet."  And then he makes her eat

5   a hot dog or sticks a hot dog with mustard or mayonnaise in

6   her mouth, and she is about to throw up.  I think that in

7   and of itself shows that he at least had physical control

8   over her.

9           Secondly, he told her not to tell her parents and

10  he wouldn't tell about the puppy coming into the home.

11  That is typically a statement -- like don't tell your

12  parents or don't tell anybody, that's our little secret, is

13  typically a statement made by someone who has supervisory

14  control over somebody else.

15          Finally, he told her that she couldn't bring the

16  puppy in, which is also a statement by somebody who was in

17  physical control of somebody else, directing her what to do

18  or what not to do.  I think all of those facts taken

19  together show that, first of all, he was exercising

20  supervisory control over her; but, secondly, he also had

21  physical custody of her.  And it looked to me like she was

22  ready to get out of that chair earlier than she was

23  permitted to get out of that chair, and I think for those

24  reasons that objection is due to be overruled.

25          Then there is objection 4 to paragraph 24 of the

**15**

1    enhancements pursuant to 4b1.5(b) of the guidelines.

2    Anything else about that?

3              MR. RASMUSSEN:  No, Your Honor.  I just wanted to

4    preserve that for the record.

5              THE COURT:  Anything from the Government?

6              MR. FORTUNE:  Your Honor, the Government would

7    rely upon once again the written response that we wrote.

8    Also, I believe the pattern of sexual conduct that was

9    engaged in is also reflected in BC's mother's letter to the

10   Court as well.  If the Court does need additional evidence

11   as to the pattern of the conduct that the victim in fact

12   did inform law enforcement that the sexual molestation

13   occurred at least 20 times, I have Special Agent Daniel

14   Barnett of the FBI here to relate that information.

15             THE COURT:  Well, there was testimony, at least

16   at the pretrial motion hearings, that it had happened

17   20 times over this period of time that the minor child told

18   law enforcement officials about, and no one has

19   contradicted that.  No one to my knowledge has contradicted

20   that it took place at least 20 times.  I don't know that

21   anybody has contradicted that.  I'm going to overrule that

22   objection.

23             And with respect to objection No. 5, which is

24   paragraph 35, 36, 37, 40, 43, 45, and 49, the probation

25   officer has amended the report to reflect those changes so

1    that those changes are now resolved.

2              Any other objections?

3              MR. RASMUSSEN:  No, Your Honor.

4              THE COURT:  Any objections from the Government?

5              MR. FORTUNE:  No, Your Honor.

6              THE COURT:  All right.  Having ruled on the

7    objections, the Court adopts the factual statements

8    contained in the presentence report with the exception of

9    paragraph 7 which I have amended -- and that change does

10   not change the guideline calculations -- and makes the

11   specific findings that the guideline offense level is 43.

12   The criminal history category is I.  The advisory guideline

13   imprisonment range is 360 months.  Further, the supervised

14   release period is any term of years up to life.  And the

15   fine ranges from 25,000 to $250,000.

16             Restitution was an issue in this case, but has

17   been resolved by the parties as stated prior to this here

18   on the record.  And I understand the guidelines are not

19   binding, but the Court does have a duty to take them into

20   consideration, at least establish what they are, and then

21   go from there to decide what is a reasonable sentence in

22   each case.

23             So I'm going to allow everybody to speak before I

24   sentence the defendant.  And, Mr. Rasmussen, if you would

25   like to go first, that would be fine if you have anything

*17*

1   to say in mitigation or otherwise.  Mr. McBurnette, if you

2   have anything you wish to say, if you have any witnesses

3   you wish to speak for you, and then I'm going to allow the

4   Government to present witnesses, if any, and also to speak

5   with respect to the sentence.

6           MR. RASMUSSEN:  Your Honor, Congress has said

7   that the sentence is 15 years to 30 years, and I submit

8   that there is a bell curve of defendants.  Many of them

9   have come before you, and the question I would pose and

10   what I'm going to argue about is:  Where on that bell curve

11   does this defendant fit?  Of course, my argument is that he

12   should be on this end of the bell curve because he is not

13   this extremely dangerous person that has done so much in

14   the past.  He has done this one time.  In considering that,

15   I think you have to consider his background, which is a

16   3552 factor.  So I'm going to talk for some time about his

17   history and the factors that I think led him into this

18   behavior.

19           And if you could go ahead and show my

20   PowerPoint.  It's not showing on this screen.  Let me try

21   one other thing.

22           THE COURT:  What are you trying to show me?

23           MR. RASMUSSEN:  A PowerPoint.

24           THE COURT:  Well, talk.  I will listen.

25           MR. RASMUSSEN:  Mr. McBurnette was born in Etowah

*18*

1  County.  This is a picture of his mother.  His mother is

2  here right now.  He had a fairly normal upbringing.  His

3  father was a very interesting gentleman and a renowned

4  artist and craftsman.  Among other things, he made knives,

5  and he's actually world famous for making knives.  If you

6  were to put his name in the Internet search engine, you

7  would pop up hundreds of Web sites which talk about the

8  quality of his work.  And this bears later on to something

9  that happens later on to Mr. McBurnette after his father

10  died.

11       What you see here is a picture of him and his

12  family.  There is his -- I don't know what that red dot is

13  doing there.  That is his sister.  That is his older

14  brother and his grandparents behind him.

15       One of the first tragedies in his life -- we will

16  talk about his love for animals and how that came about,

17  but one of the first tragedies in his life is when his

18  older brother was killed in a car wreck.  And for years he

19  had to drive by the place where he was killed, and that was

20  a very traumatic experience for him.  But he still seemed

21  to grow up and have a fairly normal life.

22       This is a picture of him in junior high school.

23  He was a fairly bright child.  His mother will tell you

24  more about that.  He was somewhat athletic.  He played some

25  football and played basketball.  He was one of those people

*19*

1    in school that didn't work a lot but managed to make good

2    grades.  And he did have some achievements when he was in

3    high school, as you can see from these different awards.

4    He was also interested at the end of his high school career

5    in music; and he was, in fact, a member of a bluegrass band

6    with the 4-H Clubs and was a champion band in his -- I

7    forget exactly what the competitions were, but he did very

8    well in that band.

9         So things were going along pretty well, and then

10   he went and joined the Navy.  At the time, he had a

11   girlfriend Tammy, who I think you read about in the report.

12   This is a picture of the wedding with his mother, his

13   father, and his sister, and of course Tammy.  And he served

14   six to eight years in the Navy.  He had submarine training

15   and was actually graduated at the top of his class in major

16   submarine training school.  He spent some years in the

17   Navy, and then he will tell you that -- or I would tell you

18   that he hurt his back in the Navy moving some things around

19   and became severely disabled, actually.  But while in the

20   Navy, he and his wife were separated for a period of time,

21   which is hard on them.  They would get together from time

22   to time.

23        His father loved to go out west, loved to be in

24   the Smoky Mountains, so he would take Tracy out there with

25   his wife to visit his father and his mother.  And

1    eventually his mother and his father and when he got out of

2    the Navy, he moved out to New Mexico as well where his

3    sister lived, his mother lived, and his father lived.

4    That's his sister right there.  That's his mother, and

5    that's his sister's children.  That's his grandmother who

6    he is very fond of.

7            So they had a good relationship, but his marriage

8    to Tammy fell apart.  He became friends with another lady

9    and moved out west, and that is Susan right there.  And

10   this is a picture of his brother-in-law, his mother, and

11   that's Tracy right there.  And all of his life, though, he

12   had always been interested in animals.  And these are just

13   some of the certificates that he had that he was given for

14   having taken care of different animals.

15           And I'm going to let some other people tell some

16   stories about how he did that.  This is one of his favorite

17   dogs called "Big Brown."  And, of course, when he moved

18   back to Alabama and Hurricane Katrina occurred, he took

19   some trips out to Hurricane Katrina to take care of those

20   dogs.

21           Now, something else happened, though.  His

22   brother had died.  And then when his father was out west,

23   his father developed cancer.  And they went through a very

24   difficult time while his father tried to beat the cancer.

25   He couldn't beat it.  Tracy took care of his mother.  But

1   then his father died, and his relationship with Susan also

2   fell apart.  So his brother had died.  His father had died.

3   He had two failed relationships, long-term relationships,

4   with the women in his life, and all he had left was his

5   animals.

6          He came back to Alabama.  And when he came back

7   to Alabama, he came back to Rocky Ford Road, and this is

8   Dale Hutton.  Dale Hutton is the brother and the uncle of

9   the victim and was the defendant's best friend growing up.

10  And Mr. Hutton lived on this plot of land that is the

11  subject of the forfeiture and everything we have heard

12  about.  And Mr. Hutton, though, was into drugs and could

13  not keep up his payments.  That's really how Mr. McBurnette

14  came to own this property.  He took it over because of his

15  mortgage and Mr. Hutton couldn't make it, and he allowed

16  Mr. Hutton to live on this property in this trailer which

17  you see behind you.  But Mr. Hutton did not keep up the

18  payments to Mr. McBurnette, and they had a falling out.

19  They had litigation, and he was evicted from the property.

20  So his best friend was now alienated from him.

21          What then happens is:  He has come back to

22  Alabama.  His best friend is no longer his best friend.  He

23  doesn't have a family around him.  He has failed

24  relationships, and I think one of the worst things is that

25  he didn't have to work because he is on disability.

*22*

1          And I know from my own experience that sometimes

2    you need people around you who are going to prop you up,

3    whether friends, whether family, whether they are

4    coemployees.  You go in, you fit into an organization and

5    it sort of props you up.  And my wife and I fight all the

6    time.  But if we didn't, I might go drifting off somewhere

7    where I shouldn't be drifting off, and she might do the

8    same thing.  So we just keep each other honest.

9          But Mr. McBurnette lost those props.  And then he

10   became a social recluse.  He started taking drugs about the

11   first time in his life.  He started taking crack and then

12   quit that and then methamphetamine.  His behavior became

13   more and more bizarre.  One thing that he told me is that

14   when he -- I don't know whether it was crack or

15   methamphetamine, but he did it with aluminum foil.  And he

16   told me the aluminum foil would just burn up, and then all

17   he was inhaling was aluminum and that he started acting

18   crazy.  His friend started acting crazy.  I was sort of

19   skeptical about that at first until I did some research on

20   the Internet, and I did find there is something to it.  It

21   can lead to dementia.  I think in Canada they banned

22   cooking utensils made of aluminum for that reason.

23          THE COURT:  All cooking utensils?

24          MR. RASMUSSEN:  I think pots and pans.  I have

25   heard that.  I'm not sure of that, but there is a plethora

*23*

1    of material about the effects of aluminum poisoning.

2            Be that as it may, he became a social recluse.

3    He had always been a neat person.  He had always been

4    organized.  He had always taken care of his things.  He

5    started letting his trailer go.  He started letting

6    everything go.  People would come to the door, and he

7    wouldn't let them in because he was so ashamed of what he

8    had become.  He was a hermit and had taken drugs.

9            And he also had some experience with adult porn.

10   You have talked about the child porn.  I can tell you that

11   the adult porn far outnumbers the child porn by a great

12   amount.  And he lost access to that because he did not have

13   Internet access for a period, and he did not have satellite

14   TV, although he had TV but not that kind.  And that's when

15   he was in this condition when the child started coming up

16   and seeing her dog, and he did take advantage of that.  But

17   is he a pedophile?  When the child said no, the child said

18   I don't want to do it anymore, and he didn't do it anymore.

19           And at that time, he started to get his life back

20   together.  His first wife came by to see him.  They

21   reconnected their relationship.  They started cleaning up a

22   little bit and as bad as the house was at the time of the

23   search, it was 100 times worse than that during this period

24   of time.  And there is a couple of things that indicate to

25   me that he was, in fact, trying to get himself back

1    together.  These are the progress notes from a VA visit,

2    and you will notice that the date.  On November 7, 2006, he

3    has gone to the VA hospital.  It talks about his past

4    medical history, that he had mainly joint pain, lower back

5    pain, neck pain, knee pain, wrist pain, elbow pain, and had

6    numbness of his right side of his right leg that goes to

7    his second toe.  And the assessment and plan on page number

8    43 says, "Chronic low back pain," and he is asked if he

9    wants narcotics.  He says he does not want narcotics at

10    this time.  This is an indicator that he is trying to get

11    his life back together, that he is not back on drugs.

12           And another indicator -- let me just go to what

13    you are going to deal with here.  It's 15 years to

14    30 years.  And, of course, on the side of the heavier is

15    the fact that this is a deplorable offense and that the

16    victim is harmed.  And what I ask you to look at on the

17    other side of it is the factors which you have to deal with

18    according to the statute, and that is his history.  He has

19    a clean record.  This is the first offense of almost any

20    kind that he has ever had.  He has had numerous acts of

21    kindness, both to people and to animals.  He has served his

22    country.

23           The issue then becomes:  What about future

24    danger?  Well, this was the only time he has ever been

25    charged with anything like this.  That doesn't mean that's

*25*

1   the only time he has ever done it.  But you have heard

2   testimony that people who are pedophiles keep their

3   trophies.  They keep all kinds of stuff.  I'm sure you have

4   seen cases where you have dealt with pedophiles.  They have

5   thousands of images.  These videos when they were found

6   were dusty and dirty and had signs of disuse.

7           If you look at the ratio of adult-to-child

8   pornography as I indicated, the ratio of adult pornography

9   far exceeds the ratio of any child pornography.  You

10  mentioned that he had made a search for child pornography.

11  Well, what the evidence in this trial showed -- and I would

12  ask you to refer again to the forensic report that was

13  introduced in evidence.  I don't know if it's here or not.

14  But I would ask you to review that, and I think what you

15  will find is:  Once the child said no, several months after

16  that in -- I think it was in September of the year after

17  that is when he went online one time, one time, and did

18  those searches.  And he didn't save any of those files.

19  Those were in the temporary Internet files.  They are not

20  downloaded in his hard drive, in the permanent folder.  So

21  that was one time.  That's not the sign of a pedophile.

22  Pedophiles and people who are interested in this kind of

23  stuff do it all the time, and he didn't before or after

24  this one time.

25          So in addition to that, I would ask you to refer

1    to the letters that have been sent to you that indicate

2    that not only has he done a lot of good deeds in the past,

3    but that I expect the witnesses to testify that there were

4    no signs that he was interested in children.

5              And then you do have the report of Dr. Aldridge,

6    and I would refer you to the conclusions of her report

7    where she does conclude this was more of a situation of a

8    one-time situation.  So when you talk about the bell curve,

9    I think he fits more on this end of the bell curve than he

10   does on this end of the bell curve.

11             There is something else to consider, which would

12   be his medical condition.  He does have a severe back

13   disability.  He suffers from a number of other conditions.

14   For example, right now he is having terrible tooth

15   problems.  He is not getting any kind of treatment at the

16   jail, and he was suffering from this during the time of the

17   offense.  He has suffered more now in the jail setting than

18   he was outside the jail setting.

19             But the last thing I want to consider is the

20   issue of -- it's not double jeopardy.  It's not double

21   jeopardy, but there is the issue of the double punishment.

22   What the federal government punishes is the use of the

23   Internet, the use of the materials produced in interstate

24   commerce.  That's what gives us jurisdiction.  The state

25   has also charged him with the offense of abusing the child.

1    And you know that we have made efforts to try to settle

2    that, and they simply won't settle it.  They do want to

3    prosecute him.

4            I know typically that you are leery of, well,

5    that's up to the Judge in the future.  That's not up to me.

6    That's up to the Judge in the future.  But I suggest it's a

7    factor to be considered when you talk about:  What is the

8    federal crime here?  The federal crime here is the use of

9    interstate commerce.

10           And also one factor which we will ask for later

11   on, whatever your sentence is, I know he is borrowed from

12   the state for the prosecution, but I think you should give

13   some consideration to the fact that he has been in jail for

14   this because it is for the same conduct.

15           So what I submit to Your Honor based upon all

16   this that he is not in this bell curve over here at this

17   end where the worst offenders are.  He is more at this end,

18   and that's where I think he should be sentenced as well in

19   this range from 15 to 30 years.  I do have some witnesses

20   to call.  Do you want me to call them at this time?

21           THE COURT:  Yes, if they will just stand up.

22   They can stay where they are, but they all need to be sworn

23   at one time.  They need to raise their hands and take the

24   oath of a witness.

25           MR. RASMUSSEN:  He has difficulty standing, Your

1    Honor.

2              THE COURT:  You can remain seated.  That's

3    perfectly fine, sir.  Raise your right hand.

4              (All witnesses were sworn.)

5              THE COURT:  Ms. McBurnette, good morning.

6              MS. McBURNETTE:  Well, Tracy was a very good

7    son.  When he was growing up, he was the person that helped

8    me.  We always had projects.  We painted the house one

9    year, both of us.  He mowed the lawn.  He took care of the

10   odds and ends while his dad worked.  He was very good.  He

11   tried to help out at home, and he was a very good son.  He

12   went to school.  He was very bright in school.  At times he

13   didn't have enough to do at school.

14             He was with the FFA.  That was one of the best

15   times and most memorable times that I remember him, one of

16   my favorite times being with him.  He had not played guitar

17   before.  And when he started up with the FFA band, one of

18   his teachers was a person that I went to school with.  So

19   he gets off the school bus one day, and he has some cymbals

20   and a rubboard.  So that was his part in the band, to play

21   the rubboard.  And then he picks up an old crockery jug

22   that I had, and he started playing that, and then he

23   decided he wanted to play the guitar.  Within two months,

24   he was playing guitar with the band.  They did win first

25   place, FFA, in Montgomery.  And they did so for three

1   years, and that was a wonderful time.  He was a very good

2   son.

3            When my husband took sick, Tracy had moved to New

4   Mexico some months prior to that.  And, obviously, it was a

5   very difficult time, very trying time, and he helped.  We

6   would go for chemotherapy in Denver and later on to

7   Albuquerque.  And from where we lived, that would be a

8   four- or five-, six-hour drive.  And when I would get in at

9   night when we would come in at 11, 12, 1:00, everything

10  would be done at the house.  The house would be warm.  The

11  animals would be fed.  Everything would be clean and taken

12  care of.  Everything was fine, so that I could get my

13  husband in and get him back up, and we went through that

14  together.  It was a very difficult time.  He was a very

15  good son.

16           He loved his grandmother.  His grandmother broke

17  her hip, and she did not recover from her hip being broken

18  so she went to a nursing home.  She was there five years.

19  He would go down and tend to her, and he would tend to her

20  at any time that he had an opportunity.  He loved her very,

21  very much.  And she lived to be 97 years old.  We had her

22  here a long, long time.

23           And he was always a very good son to me.  And

24  when this all happened, it was such a shock to me.  I knew

25  that there was a mistake.  Something had happened.  It

*30*

1    could not have been my son.  That was not my son.

2              MR. RASMUSSEN:  Ms. McBurnette, let me ask you

3    this:  Growing up and in his early adulthood, what was his

4    hygiene like?

5              MS. McBURNETTE:  Oh, he was very, very clean.  He

6    showered all the time.  He kept his cars perfectly clean.

7    The car was washed every day.

8              MR. RASMUSSEN:  And when he moved back to

9    Alabama, were you all in Alabama?

10             MS. McBURNETTE:  Yes, I was back in Alabama.  He

11   lived there with me from about 15, 16 months before I left.

12             MR. RASMUSSEN:  And you moved out to where?

13             MS. McBURNETTE:  I moved to El Paso.

14             MR. RASMUSSEN:  At that time, was he still a neat

15   and clean person?

16             MS. McBURNETTE:  Absolutely.

17             MR. RASMUSSEN:  Was there a time when you came

18   back to Alabama?

19             MS. McBURNETTE:  Yes.  I would come back from

20   time to time.

21             MR. RASMUSSEN:  After you started coming back,

22   did you get to see inside the house?

23             MS. McBURNETTE:  I did the first couple of times,

24   and I didn't see anything wrong.  And then it got to where

25   he would -- if I would need things from the house, he would

1    bring them to me, and then I realized that he really didn't

2    want me to go over there.

3            MR. RASMUSSEN:  Now, after he was arrested, did

4    you come back down?

5            MS. McBURNETTE:  Yes.

6            MR. RASMUSSEN:  Did you see the house?

7            MS. McBURNETTE:  Yes.

8            MR. RASMUSSEN:  What was your reaction when you

9    saw the house?

10           MS. McBURNETTE:  Shock, absolute shock.  I

11   couldn't believe it.

12           MR. RASMUSSEN:  Why was that?

13           MS. McBURNETTE:  It was a new house and it was --

14   the carpets were torn.  The Sheetrock was torn.  It was

15   chewed up by the dogs.  The furniture was chewed up.  It

16   was filthy.  It looked like it had a quarter-inch of dust

17   on it.  It smelled horrible.

18           MR. RASMUSSEN:  Was that consistent with what you

19   had thought your son to be?

20           MS. McBURNETTE:  Oh, no.  Not at all, no.  That

21   couldn't possibly happen, couldn't possibly happen.

22           MR. RASMUSSEN:  Is there anything else you would

23   like to tell the Judge?

24           MS. McBURNETTE:  Well, Tracy was always a good

25   son.  He didn't get into trouble.  He was a kid, and then

*32*

1    he grew up, but he was a good son.  He worked hard.  He

2    tried to help.  He tried -- he was a member of the family.

3    When his dad was sick, I don't think I could have made it

4    without him.  I guess I would have.  I always seem to

5    manage, but I don't know how.  He was very good, and he

6    always tried to take care of me.  He tried to take care of

7    his grandmother.

8             MR. RASMUSSEN:  Thank you.

9             THE COURT:  Thank you.

10            Any questions, Mr. Fortune?

11            MR. FORTUNE:  No, Your Honor.

12            MR. RASMUSSEN:  Susan, would you come and tell

13   the Court your name.

14            MS. ROBERTSON:  Susan Robertson.

15            MR. RASMUSSEN:  Tell us how you came to know

16   Tracy.

17            MS. ROBERTSON:  I met Tracy when I was about 19

18   years old.  He was a friend of my sister's boyfriend.  And,

19   you know, when I first met him, he was just not my type.

20   And then after going out a couple of times, he was, you

21   know.  We were together for about 14 years.  He was never

22   abusive.

23            We did do a brown pelican rescue at one time, and

24   that was my first experience with rescuing animals.  It was

25   pretty amazing, you know.  And just being there together as

*33*

1    a couple doing this was unique.

2            I have a little sister and three nieces, all at

3    that time when we were seeing each other, young, and they

4    spent a lot of time around us.  There was never anything at

5    all inappropriate, and we were a family.  We were a unit,

6    you know.  I don't think that this is something that he

7    would ever do again because it's not something that he

8    would have done normally to start off with.  It was a

9    mistake.  And everybody should get one mistake that they

10   aren't convicted for life, you know, on.

11           MR. RASMUSSEN:  Did you live with him in New

12   Mexico?

13           MS. ROBERTSON:  Yes.

14           MR. RASMUSSEN:  Did he take part in animal

15   rescues there, too?

16           MS. ROBERTSON:  Yes, he did.

17           MR. RASMUSSEN:  Was it just dogs or pelicans?

18           MS. ROBERTSON:  No, we had several dogs.  Big

19   Brown, she was an abused dog that we took from this guy who

20   was a jerk.  And then there was a horse that he took from

21   this guy that just neglected it.  And we brought it to the

22   house, and the horse didn't like him.  It bit him, but he

23   took care of him, you know.

24           And there was several -- when we first moved into

25   our house, there was probably about 25 wild cats that we

*34*

1    went out of our way to trap and bring to get fixed and

2    vaccinated.  And to this day, there is still probably -- I

3    think there is probably only about four left because they

4    have all kind of went their -- you know, died.

5              MR. RASMUSSEN:  That's all.

6              Do you have any questions, Your Honor?

7              THE COURT:  Why did you leave him?  Let me put it

8    this way:  The report from his psychologist, or the doctor,

9    says that he told her -- it's on page 9:  "He spent about

10   12 years with Susan Robertson, and he said she left him

11   because of his mood swings and depression."

12             MS. ROBERTSON:  Yes.  He required a lot more care

13   than I could give with the expense -- I was putting in so

14   much that I was losing myself, so I had to step back.

15             THE COURT:  Okay.

16             Anything from you, Mr. Fortune?

17             MR. FORTUNE:  What years, what was the time frame

18   of your relationship?

19             MS. ROBERTSON:  I was 19 when we first met, and I

20   think I was 34 when we split up.  It was 14 years.

21             THE COURT:  We are trying to find out when that

22   was.  We don't know how old you are.

23             MS. ROBERTSON:  I'm 42.

24             THE COURT:  So go back 23 years from 2009, and

25   that will get you the beginning of the time frame.

*35*

1        MS. ROBERTSON:  That sounds about right.

2        MR. FORTUNE:  All right.  Thank you.

3        MR. RASMUSSEN:  And, John Alexander, you can come

4   if you want to or you can stay there.

5        THE COURT:  Good morning.

6        MR. ALEXANDER:  I can't add anything.  All I can

7   do is tell you that --

8        THE COURT:  Your name, sir?

9        MR. ALEXANDER:  John E. Alexander.

10        THE COURT:  How do you know Mr McBurnette?

11        MR. ALEXANDER:  I have known him since he was

12   about 6 years old.  He went in the Navy when he was of age,

13   I suppose, and stayed for quite a few years.  I didn't see

14   him then.  Of course, he lived in New Orleans and Texas and

15   New Mexico, and I didn't see him then.  I only saw him

16   again when he came back here to Alabama, but he was

17   attentive to me.  I had knee surgery, and he would take

18   care of me.  And I did enjoy watching him with his

19   grandmother.  He was very attentive to his grandmother and

20   his mama.

21        But like I say, I can't add anything to what they

22   say.  I can only tell what I saw, and I enjoy his company.

23   He would make sure that we would go eat two or three days a

24   week, and it helped me a lot.

25        THE COURT:  Thank you.

36

1        Any questions, Mr. Fortune?

2        MR. FORTUNE:  No, Your Honor.

3        MR. RASMUSSEN:  Your Honor, one other thing I

4   want to bring up that I think I sort of skipped in the

5   PowerPoint:  This is a newspaper article where somebody

6   wrote in the newspaper commending Mr. McBurnette for his

7   honesty.  He had found a wallet of this gentleman and

8   returned to this gentleman.  He was so impressed that he

9   wrote to the newspaper about it.  And it's consistent with

10  Mr. McBurnette's tendency for acts of kindness not just to

11  animals but to people as well, notwithstanding what he did

12  during the course of this offense.

13        That's all I have, except that I would like to

14  make sure that Ms. Aldridge's report is an exhibit as well

15  as received, and I think I have a copy of that.

16        THE COURT:  Yes.  Mine has writing all over it.

17  It would be Defendant's Exhibit No. 3, and it's admitted.

18        MR. RASMUSSEN:  Your Honor may also recall --

19        THE COURT:  Are you including her CV?

20        MR. RASMUSSEN:  Yes.

21        THE COURT:  Just make it all one composite

22  exhibit.

23        MR. RASMUSSEN:  During the course of the trial, I

24  believe the Government showed some pictures of his house

25  and the disrepair that it was in, and that is reflective, I

1    think.  The deterioration of his house is reflective of the

2    deterioration of his mind during that period of time, which

3    is illustrated by the fact of what it had been like before

4    that.  I just want you to take that into consideration.  I

5    do have some pictures.

6              THE COURT:  Yes, I remember that.  I also

7    remember Debbie Barnett's testimony of the motion to

8    suppress where she said that she sat in the chair, and the

9    urine from the dogs from the chair soaked through her

10   clothes.  I remember that.  It's hard to forget.

11             MR. RASMUSSEN:  There is one other factor.  It is

12   sort of just a nonfactor.  I think the prosecution at one

13   time referred to some children's books that were found at

14   the residence, and Ms. McBurnette will tell you, I think,

15   those were her books.

16             MS. McBURNETTE:  I believe that those books were

17   my children's books that had been brought from New Mexico.

18             THE COURT:  Does your client wish to say

19   something himself?

20             THE DEFENDANT:  Yes, ma'am.

21             MR. RASMUSSEN:  He would like to say it from

22   there because he would like to address the family as well.

23             THE COURT:  All right.  We need to put him under

24   oath.

25

1          **MARTIN TRACY McBURNETTE,**

2     called on behalf of the defense, having been first duly

3     sworn, was examined and testified on his oath as follows:

4     **EXAMINATION BY THE COURT:**

5          A     I wanted to clarify one thing before I get

6     started.

7          Q     State your name for the record, please.

8          A     My name is Martin Tracy McBurnette.  I just

9     wanted to mention that nobody saw my house the way it was

10    before I let anybody come over.  The first person that come

11    over was my ex-wife Tammy.  I finally let her in because I

12    knew I needed some kind of help.  But before she made it

13    over, I cleaned up my house with a snow shovel and a rake.

14         Q     Which time frame are you talking about now?

15         A     This was near the end of when I was doing drugs

16    and stuff.

17               It was literally ankle deep in filth.  Anyway, I

18    wanted to clarify that.  And I've got two publications I

19    just wanted to read a couple of short excerpts out of.

20    They are both spiritual publications, and I have a couple

21    notes here.

22               When I was taken to jail on November 9, 2007,

23    Investigator Jones suggested that I do a lot of soul

24    searching.  It was good advice, and I spent my time in

25    suicide watch doing just that.  And on November 14, 2007, I

**39**

1    just fell to my knees and I asked God to please help me.

2    He responded by allowing me to receive his Holy Spirit, and

3    I repented my sins and I accepted Jesus Christ as my savior

4    at that point.  But I still had a lot of questions, as did

5    everyone else that knew me.  What happened?  What happened

6    to Tracy?  What happened that he could do such a terrible

7    thing and hurt people that he loved, people that he had

8    known practically his whole life?  How could he hurt a

9    child?

10          When I finally got my hands on the Bible, I

11   started reading, and I started getting some answers.  My

12   Aunt Jeanne recommended I read the book of Romans, and I

13   read in there about how we are all born with a sinful

14   nature that we are always battling against and that without

15   your good judgment and common sense and without God's holy

16   spirit, the devil will be able to use you for his own evil

17   purposes; and anything that affects your good judgment puts

18   you on a path to destruction.

19          I was exposed to sex and pornography at a very

20   young age, not in my home but outside my home.  My whole

21   life could not have been better.  I could not have had a

22   better family or parents.  Many years later I found myself

23   alone in New Mexico when Susan and I had broke up.  And it

24   was my fault because it sure could not have been Susan's.

25   I found myself with a lot of time in the middle of nowhere,

*40*

1    and I started looking at things on the Internet that I
2    shouldn't have, and that's when I first started turning to
3    drugs and alcohol in a serious way.

4         In this one publication it says, "When a person
5    thinks bad thoughts, he nurtures wrong desires.  These in
6    turn may lead to harmful acts.  For example, casual
7    interest in pornography may develop into an obsession with
8    sex that impels a person to act on his fantasies, perhaps
9    in a criminal way."

10         When I moved back to Alabama, I was trying to
11   escape what I was in in New Mexico and get back into some
12   kind of social life, some kind of routine.  And I wanted to
13   fit in so badly with everyone.  My reputation as a
14   do-gooder or whatever had preceded me.  Everyone kind of
15   expected me to be a stick-in-the-mud, so I was going to
16   show them different.  So I was willing to disregard the
17   warnings from my family and the good advice from friends I
18   had all my life and my own better judgment.  And I
19   participated in things that I shouldn't have, things that I
20   knew better.

21         And it wasn't just what we smoked.  It was how we
22   smoked it.  Mr. Rasmussen indicated we smoked
23   methamphetamine on aluminum foil.  And when you run out of
24   the particular aluminum foil that you are supposed to use,
25   you kind of break down and get some thin aluminum foil, and

*41*

1   it burns through.  And when it burns through, you smoke the

2   aluminum.  And I later learned that smoking aluminum causes

3   aluminum toxicity, and that causes mental problems, and I

4   didn't know that at the time.

5          And I expressed my concerns to the guys I was

6   partying with that we had to stop doing it, at least that

7   way.  I got that information from a friend of mine who sent

8   it to me.  She got it from Medicinenet.com.

9          It says here, "It is extremely difficult for any

10  person to make significant behavioral changes or lifestyle

11  modifications.  When changes do occur, they are usually

12  preceded by some major conflict or trouble.  When mood- and

13  mind-altering chemicals enter the picture, the degree of

14  difficulty is greatly multiplied.  Chemicals affect the

15  brain, distorting our thoughts, and therefore dictating

16  unacceptable behavior.

17         "One may be addicted to nicotine, alcohol, pot,

18  cocaine, heroin, or food, gambling, lying, cursing, sex,

19  pornography, work, resting, exercise, TV, overspending,

20  sports, controlling others, et cetera.  Please don't

21  misunderstand.  There is an extra and very potent

22  ingredient involved when a chemically addictive substance

23  is part of the equation due to biochemical changes in the

24  body and especially in the hijacked brain.

25         "Also, there is an undeniable difference in the

*42*

1  consequences that result from lawless acts committed under

2  the influence.  It is not an excuse.  It's just a hard

3  reality of the situation.  How many have said I never would

4  have done that if I had not been stoned?  Truthfulness is

5  not in question.  However, the fact is I was stoned, and I

6  am responsible and I'm now going to suffer certain

7  consequences as will all my victims."

8      Q    Are you reading or are you saying this yourself?

9      A    I read just that part out of this publication.

10 Now I'm back to my notes.

11     Q    Okay.  You are not maintaining you were stoned,

12 were you?

13     A    I was taking drugs at the time, yes, ma'am,

14 absolutely.  I was since the time I moved back to --

15     Q    I'm talking about at the time you produced the

16 videotape that you were convicted for.  Were you saying you

17 were stoned?

18     A    I had a drug habit, yes, ma'am.  When I first

19 moved back, I turned it down several times, but I finally

20 gave in, but that was very soon after I moved back.

21          I would like to apologize to [redacted] and her

22 family for the untold pain and suffering and anguish that I

23 have caused you, for throwing your once peaceful lives into

24 utter turmoil, for destroying our relationship that took

25 decades to build, and for betraying trust that required

*43*

1    decades to earn.

2              I want to apologize to my family and my friends

3    for the undeserved hell that you have had to endure.

4              I want to thank God for my family's unwavering

5    courage, prayers, love, and support.  Some have traveled

6    great distances, and some have come in great physical pain

7    in order to be present on my behalf, and some like my mom

8    have managed somehow to do both.

9              I also want to thank God for the best attorney in

10   the form of Michael Rasmussen that anyone could ever have

11   at any price, one who believes in me despite some very

12   difficult circumstances.

13             I want to apologize to the court and to Your

14   Honor, the prosecutor's office, and the district attorney's

15   office, and the American taxpayers for having consumed

16   time, energy, and other resources that could have been used

17   elsewhere.

18             And I'm sorry that I couldn't sign a plea

19   agreement.  I wanted to.  But the length of the possible

20   sentences, the fact that I had state cases pending, and the

21   question of whether or not they would be run concurrently

22   or consecutively rendered it impossible for me to sign a

23   plea agreement.  I couldn't provide any substantial

24   assistance because I just don't know anybody or of any

25   activities of any criminal significance.

*44*

1        When I was very, very young, one of my first
2   memories when we were living in Rainbow City is that my
3   neighbor had a dog and she had puppies.  And one Sunday
4   morning Mom had me dressed up to go to church.  And he
5   said, "Do you want to see the puppies?"
6        And I said, "Yes.  Can we go see the puppies?"
7        So we went and saw the puppies.  We went back
8   several days later, and that's when we realized that on our
9   previous visit we had inadvertently locked the door.  The
10  mom couldn't get to them to feed them, and all of them
11  except two of them died.  It affected me in a way that I
12  can't really explain, and it's caused problems for me later
13  in life.  I became obsessed.  Since I couldn't bring the
14  puppies back, I spent the next 40 years trying to bring
15  those puppies back to life.  Couldn't do it.
16       So I became obsessed with the next best thing,
17  which was to save as many others as I could save.  And I
18  promised each one as I rescued them that they would never
19  suffer again.  And the only way I can do that in my mind,
20  the only way I can make sure they weren't chained up or
21  starved or left out in the cold or beaten was to keep them
22  myself.
23       And things went okay for a while, and I would
24  take rescued animals down to the nursing home where my
25  grandmother was, and it was a mutual beneficial thing for

*45*

1   everyone, the animals, the people, and for me, very
2   rewarding.  But as they grew in number, it became more and
3   more difficult for me to leave them alone and run even the
4   simplest of errands like going to get food for them or
5   myself.  And I believe that I isolated myself in such a
6   manner that contributed to my succumbing to evil desires
7   and to my acting in a criminal manner.
8          With my last ounce of willpower and with the help
9   of my ex-wife, Tammy, I managed to stop doing drugs.  I
10  stopped drinking.  I stopped looking at pornography.  I
11  started pounding the vitamins, and I was trying to detoxify
12  myself.  And, slowly, as my mind began to clear, the
13  reality and the horror of what I had done began to sink in.
14  And the thought of it tore at me every day and night.  It
15  was the first thing I thought of when I woke up in the
16  morning, and it was the last thing I was thinking of when I
17  tried to go to sleep at night.  No one is in more shock and
18  disbelief over what I have done than I am, and no one hates
19  me more for what I've done than I do.  I wanted so
20  desperately to undo what I had done; but, of course, that
21  was impossible.
22          Again, I tried to do the next best thing and
23  confess my sin, and I went over to [redacted] father's
24  house.  I went over to Jeff's house one night, and I had
25  mama dog with me.  It was a dog that me and him had rescued

**46**

1   together.  We rescued her and all her puppies.  And Jeff

2   was my hero for that, and I told him so.  And I was going

3   to tell him what I had done, but I didn't have the guts.

4          Later on I saw [redacted] walking with the cows

5   out in Mr. Little's pasture, which is next door to my

6   house.  So I went outside and went over to the fence and I

7   called over to the fence, and I told her how sorry I was,

8   how sorry I was that I had hurt her.  And I begged her to

9   forgive me.  She said, "You didn't hurt me."

10          Of course, she didn't know that I had hurt her

11   very badly.

12          I'm begging you for your forgiveness, and I'm

13   asking for help.  I'm reading from a publication now that

14   says, "In God's eyes, no one is automatically a lost

15   cause."

16      Q    What publication is this, sir?

17      A    It's from Awake.  "In God's eyes, no one is

18   automatically a lost cause.  God's son, Jesus Christ, said,

19   'I have come to call not righteous persons but sinners to

20   repent.'  It is true.  Adjusting to living by Bible

21   standards may be a challenge, but success comes to those

22   who are patient and who take advantage of the help God

23   provides, including the loving support of spiritually

24   minded Christians."

25          And God has provided me that support of

47

1    spiritually minded Christians in the form of my friends and

2    family.

3           "When honest-hearted ones gain knowledge of the

4    true God, they deeply regret their past wrong and are moved

5    to express heartfelt repentance.  Simply put, a person

6    shows by his new way of life that he really means it when

7    he says I'm sorry.  It is true because of imperfections and

8    weakness even genuine Christians sin, sometimes seriously.

9    But their failings do not reflect an entrenched evil

10   disposition.  It's not only the sin but also the attitude

11   of the sinner that Jehovah God knows.  We can be sure,

12   then, that both Jesus Christ and his Father will show

13   compassion toward all who manifest true repentance

14   regardless of their past deeds."

15          Back to my notes, my number one prayer will

16   remain as it has been for so long, for our God to bless and

17   heal [redacted] and the broken hearts of all those I have

18   hurt so deeply.  I also pray that my true character will

19   not be forgotten by those who know me.  And that it will

20   become apparent to those who don't in the holy name of

21   Jesus, amen.  Thank you.

22          THE COURT:  You are welcome.

23          Any questions?

24          MR. FORTUNE:  No, Your Honor.

25          THE COURT:  You may step down.

*48*

1        Anything else, Mr. Rasmussen?

2        MR. RASMUSSEN:  No, Your Honor.

3        THE COURT:  Anything from the Government?

4        MR. FORTUNE:  Yes, Your Honor.  At this time, the

5  Government would call Brenda Chapman, the mother of BC, the

6  victim in this case.

7                        **BRENDA CHAPMAN,**

8  called on behalf of the Government, having been first duly

9  sworn, was examined and testified on her oath as follows:

10     A    Let me see if I can do this.  This is hard.

11  Sitting here today and listening to the things that have

12  been added, my mind flashes through the last 20 years of

13  growing up with Tracy and his mother.  I remember her

14  burning us up with chili, me and Kelly.  I have fond

15  memories of growing up with them.  They were a part of our

16  family.  His sister was my best friend.  My brother was his

17  best friend.  They were good people.  They treated us good.

18  I never had any complaints.

19          They have talked about the drugs they did or

20  didn't do.  I can remember riding to school, and I remember

21  Tracy and Dale and them smoking pot from high school days

22  at the tree.  And I remember them partying at the creek.

23  Bear Creek, I think, is what they used to call it, and they

24  have done drugs since high school days, you know.  And I

25  fell in there right behind them.  So I know the people that

*49*

1  he ran with then.

2          Years ago I made changes in my life regarding my

3  daughters and my family, the life I wanted to live and what

4  I wanted to give them, and drugs was not part of it.  And

5  it contributed to me not doing drugs.  It contributed to

6  the divorce of [redacted] daddy because he did continue to

7  smoke.  And he was friends with Tracy and a few other ones,

8  and I know they partied together from day one that they was

9  out there.

10          And Tracy and his love for animals has been as

11  long as I remember.  And I can remember my daddy shooting

12  one of his dogs with buckshot and me jumping my daddy for

13  it.  I said, "You didn't have no right to do that, you

14  know."

15          If Tracy's animals got loose, I would call him.

16  Gizmo is loose, the so-and-sos are loose, whatever.  He

17  never hardly ever answered the phone.  But a minute or two

18  later I would see him in the truck going down the driveway,

19  and he would go get them.  He is probably the only reason

20  why I spay and neuter my animals, the influence he had

21  because of the love that he had for animals.  He did

22  positively influence me in that, but my daughter is not an

23  animal.  My daughter was 7 1/2 years old and had been

24  taught to trust him through her parents and us because I

25  trusted him.  And I allowed her to go down there because

1   that was part of the agreement that we had, was when we

2   talked her into letting her give Gizmo to him because he

3   was too much of a dog.  He was too massive.  He literally

4   yanked her right out of the swing-set because he was so big

5   and just playful and hyper.  She couldn't handle him.  She

6   was too small and he was too big.  And the deal was that if

7   he took him, that she could go see him and play, and that

8   was fine.  So when we wanted to go, we would always call.

9   Can she come down, or she would call.  "Mama, can I call

10  Tracy to see if I can go see Gizzy?"  Yes, I didn't fear

11  it.  Why?  Why should I?  Why should I fear her going to

12  see him or the dog?

13          But I can tell you the memories that I have now

14  of watching him do what he did to my daughter will haunt me

15  for the rest of my life.  I dream it.  I see what he did to

16  her, and I can't find that spot in my heart yet to forgive

17  him for what he did.  To see her sitting in that recliner

18  and her feet not even touching the floor and the back of

19  that chair so big and her so small sitting there and her

20  just twiddling her hands and looking around, it's like she

21  sensed that she knew something.  And to hear him after the

22  little part with the blindfold to tell her you come back

23  and see the birds tomorrow just to get her back down there

24  for a little more from my 7 1/2-year-old daughter who

25  just -- like I told you, she has no childhood memories

*51*

1   anymore.  Those are her memories, and that is what is going

2   to stand out in her head.  And I'm doing everything I can

3   do to change that.  She is getting counseling.  She is

4   still involved in Girl Scouts, and we talk about the good

5   deeds that he has done for the animals.

6           Are you aware that [redacted] saved Mr. Little's

7   life that year, that his house was on fire and she banged

8   on the door?  She also earned the Bronze Cross Award for

9   the Girl Scouts.  She was front page of *The Gadsden Times*

10  for saving that man's life at 8 years old.  So she's done

11  her positives, too.

12          All of us have been so affected by it.  She

13  sleeps with a bat.  She used to go out in the yard at

14  nighttime, and just turning the porch lights on would be

15  enough.  And she would go out in a fenced back yard.  She

16  won't do that anymore.  She won't stay by herself in the

17  house.  When it starts getting dark, I have to make sure

18  that somebody is there.  Either she goes to Papaw's or

19  Lindsey or her sister.  Somebody is there because she don't

20  like to be alone anymore.  She don't like to be in the

21  house when it's dark, and she has been affected.

22          No matter how she expresses it in her way, it's

23  there.  And it's going to continue to come out the older

24  she gets.  And I hope and I pray every day that the

25  counseling that she is receiving will be enough, will be

1    effective that I can be a positive impact on her now to try

2    to lead her and to give her what she needs so that one day

3    her husband and children, just like I said there, don't

4    have to carry the burdens of her childhood because it's

5    going to impact how she raises her kids, how she treats her

6    husband.

7              And she is only 11 years old now.  She has the

8    rest of her life.  If she lives to be 80, she will carry

9    her sentence, as I worded it, for 73 1/2 years.  His 15 to

10   30, 15 to 30 years is not enough to me.  It's not enough

11   for her because she, minimum, gets 70 years that her

12   sentence will be because those scars for her will never go

13   away.  They will never go away for us, her immediate

14   family, or her children, either.

15             I don't know what else to say.  There's more, but

16   it just can't come out, you know.  But I do know that

17   Ms. Mac, is what I have always called her -- Ms. Mac, they

18   were good people and he was raised right.  And Neeny, his

19   grandmother, I remember her because I used to go and eat

20   cookies with her, you know.  They were good people.  They

21   don't deserve it no more than we do.

22             THE COURT:  Any questions, Mr. Rasmussen?

23             MR. RASMUSSEN:  No, Your Honor.

24             MR. FORTUNE:  Your Honor, the Government has

25   already filed an extensive written response, which is

*53*

1    document 70, in regard to argument for sentencing, that

2    30 years in prison followed by lifetime supervised release

3    is a fair and reasonable sentence.  In regards to some of

4    the arguments presented by defense counsel as well as his

5    witnesses, Your Honor, one mistake is forgetting your keys.

6    One mistake is running a stop sign that you didn't see.

7    This defendant methodically groomed this child,

8    methodically stalked this child, preyed upon this child,

9    and manipulated her.  His planning was clear and his

10   interest -- Defendant's Exhibit 3 is, I believe, the

11   defendant's expert and psychologist and her psychological

12   evaluation of the defendant.  And I would ask the Court to

13   review that specifically and give it the weight that it

14   deserves.

15            Throughout that evaluation, what stands out to

16   the Government is that there is no mention of his obsession

17   with child pornography.  There is references to

18   pornography, but there is absolutely no reference or

19   analysis or taking into consideration this defendant's

20   obsession with child pornography.  Defense counsel just

21   stood up here and indicated that it was a one-time search

22   for child pornography.  The other witness wants to

23   reference that this was a one-time mistake.  The evidence

24   clearly shows that that is not true, Your Honor.  Those

25   arguments are without merit.  Specifically, what were

1  introduced as Government's Exhibits 40 and 41 at the time

2  of trial -- I would like to mark these as Government's

3  Exhibit A and Government's Exhibit B -- these are the

4  notable typed URLs and notable Internet history reports

5  that were conducted by the computer forensic examiner.

6          And even at trial, the defense attorney's expert

7  did not dispute any of this, these results -- did not

8  dispute that both the laptop as well as the desktop

9  computer that was in disarray were both used to actively

10  search for and find images of child pornography.  The issue

11  was whether the Modified Access Creation Date, whether the

12  MAC dates, were reliable in regards to the time frame.  And

13  the defense expert indicated and testified that those

14  Modified Access Creation Dates were reliable, and his

15  testimony was that all of this searching and looking for

16  child pornography occurred in 2004, years before the actual

17  victimization of this child.

18          Your Honor, if I may approach with what will be

19  marked as Government's Exhibit A and Government's Exhibit

20  B.  I'm using letters since defense attorney used numbers.

21          THE COURT:  That's fine.  I have seen them.  They

22  were introduced at trial, but you are welcome to

23  reintroduce them.  They are admitted as Government's

24  Exhibits A and B.  I was there.

25          MR. FORTUNE:  Your Honor, in regards to the

1    search terms which were introduced at trial for

2    demonstrative purposes, that were not actually introduced

3    into the record but were introduced as Government's Exhibit

4    39 at the time of trial -- I would like to mark this as

5    Government's Exhibit C -- these are the Internet search

6    terms and summary --

7         THE COURT:  I was at trial, Mr. Fortune.  I heard

8    everything that was said.  You are welcome to introduce

9    them, but I remember what was done during the trial.

10        MR. FORTUNE:  Your Honor, what I would note is

11   specifically numerous different dates and numerous

12   different times that this defendant was using both

13   computers to actively search for child pornography.  His

14   interest in child pornography spans much more than just one

15   incident, one accident, one mistake.

16        In regards to the video evidence that was

17   introduced at trial, the Court once again was at trial and

18   recalls that this wasn't just one day where all of this

19   occurred.  There was a grooming process, and it was

20   plotting and planning even to the effect of him going and

21   having two cameras:  One, so he could see what the child

22   was watching on TV; and, two, so he can see the child's

23   reaction as she was watching images of adult pornography.

24   And even furthermore, he took the time to plot and plan and

25   put a dollar bill in the middle of the room, filmed this,

1    and tell the child "I'm going to take a shower, make sure

2    you don't bring any of the dogs in the house."  The

3    evidence clearly showed the defendant manipulated the money

4    so it was clearly within the frame of the shot.

5            After this defendant sodomized this child -- and

6    the Court saw that; we saw that at trial -- after he

7    sodomized this child, he then used his previous setup, his

8    previous grooming, to try to hide his sodomization of this

9    child by saying, "I was looking through the video, and you

10   know what?  That day when I took the shower and I told you

11   not to bring any dogs in the house, I must have left the

12   tape running accidentally, and guess what I saw.  I saw you

13   bring the puppy in the house.  You don't tell about our

14   little secret.  I won't tell about your bringing the puppy

15   in the house."

16           That's not a man who made one time mistake.

17   That's a man who thought and planned and methodically

18   thought about how he was not only going to victimize this

19   child but how he was not going to get caught.  Think about

20   the actual sodomization act, Your Honor.  There was a

21   syringe.  There was a cucumber.  There was a sauce.  What

22   were all those for?  How long did it take him to think

23   about what would simulate or what would act as if a male

24   ejaculated in your mouth to cover that up?  The blindfold,

25   this was something that -- and the Court has witnessed his

1    testimony.  He is a very smart man.  He is a very

2    intelligent man.  He planned on how he was going to abuse

3    this 7 1/2-year-old child, Your Honor.  That's what he did.

4    Not a one-time mistake.  He thought, he planned.

5            The United States sentencing guidelines do have a

6    pendulum, does take into effect the ranges, et cetera, of

7    15 to 30 years.  For the least offender, it begins at 32, a

8    presumptive 32.  But then there are additional

9    circumstances, additional things that the sentencing

10   guidelines take into effect.  Given the nature and conduct

11   of this defendant's actions in this case, which gives us --

12   we go from a baseline pendulum of 32 all the way to a level

13   of 43 giving the sentencing guidelines and recommendation

14   of life, Your Honor, because the sentencing guidelines take

15   into effect everything that he did and appropriately

16   recommend the maximum of 30 years followed by lifetime

17   supervised release, Your Honor.

18           If I may approach with Government's Exhibit C?

19           THE COURT:  The search terms?

20           MR. FORTUNE:  Yes.

21           THE COURT:  It's admitted.

22           MR. FORTUNE:  Your Honor, also the Court is aware

23   that the Government at the time of trial introduced what

24   was marked then as Government's Exhibit 43 that were actual

25   printouts of the images of child pornography that were

*58*

1    found on this defendant's computer.  I will defer to the

2    Court's discretion.  If the Court needs to review those

3    images, I have those images, some of those images, Your

4    Honor, his search terms were for 10-year-old children.

5    They depict children around the same age as this victim

6    that he produced the actual images of child pornography

7    with, Your Honor.  And they also show sadistic type of --

8    they show actual penetration.  They even show some

9    bounding, Your Honor.

10            It is clear given the plotting, the planning, the

11   sophisticated nature for which this defendant planned on

12   how he was going to sodomize this child, then sodomized the

13   child and then planned on how he tried not to get caught

14   that he deserves the maximum by this Court.  The Government

15   is asking that the Court impose a sentence of 30 years

16   imprisonment followed by lifetime supervised release in

17   addition to the terms and conditions recommended in our

18   filed written report.  That does include the registration

19   as a sex offender.

20            MR. RASMUSSEN:  May I have a brief response, Your

21   Honor?

22            THE COURT:  Okay.

23            MR. RASMUSSEN:  I'm not here to defend his

24   conduct, but I just point out that what I was referring to

25   in my opening was a laptop and what happened afterwards not

**59**

1    what happened before.  What happened before is also a one

2    time.  I just want to clarify one thing about when you were

3    questioning him:  I don't think he meant to say that when

4    he was doing this offense he had drugs in him at that time.

5    I think he would say that to you now.  He wasn't smoking

6    something that day.  And the only issue now, though, is --

7    again, I'm not defending what he did.  The question is:

8    What now?  What now?  And you have actually handled more of

9    these cases than I have, and you are the best person to put

10   these in the context of all the other cases and give an

11   appropriate sentence, and we rely upon you to do that.

12   Thank you, Your Honor.

13           THE COURT:  Thank you, Mr. Rasmussen.

14           I have heard a lot today.  And I have heard to

15   summarize why the defendant says he should get a sentence

16   in the low end of the guidelines.  I can summarize it.

17   First of all, he says he lost his props.  He didn't have

18   any friends anymore.  He didn't have anybody to prop him up

19   and pick him up when he was down.  Well, he had the minor

20   daughter's family.  We have just heard from her mother that

21   they were friends.  And if I understood her testimony

22   correctly, until she found out what he had done to her

23   minor daughter, they were family friends.  They lived next

24   door to each other.  I know that he lost as a friend the

25   victim's uncle, but there were people there in the

*60*

1   neighborhood who were at least somewhat props.

2          And he blamed it secondly on methamphetamine.

3   Well, I have dealt with a lot of methamphetamine users, and

4   not all of them did what he did or have done what he did.

5   I don't know exactly how methamphetamine use translates

6   into the commission of the crime that he has been convicted

7   of; but if, in fact, he is correct that it causes brain

8   damage and that brain damage is irreversible, then there is

9   nothing that can be done about it.  His brain is as it is

10  now, which means that he might do it again if you take it

11  to its fullest consequences.

12          Then he said, "Well, I lost access to adult porn

13  so I had to commit this act."

14          And I have already quoted from the report where

15  quoting her, "He abused the child because he felt he could

16  get away with it.  Again, he reiterated it was not that he

17  wanted to have sexual contact with a child.  He wanted to

18  have sex and she was there."

19          And I'm not sure how loss of adult porn can

20  excuse a man from committing the crime for which he was

21  convicted.

22          Then he said his medical condition was an excuse

23  or a factor for the Court to take into consideration

24  because he has terrible teeth problems.  You get terrible

25  teeth problems from methamphetamine use.  And that is a

1    well-known consequence of methamphetamine use.  I don't

2    think teeth problems had anything to do with his childhood

3    or the loss of the puppies when he was young or the

4    exposure to abuse from a friend when he was young, which he

5    has never stated to anyone what this abuse consisted of.

6            Then there are the issues about double punishment

7    because he has been charged in state court with rape,

8    sodomy, and sexual abuse of a minor child.  And he is now

9    convicted in federal court of a federal crime that has some

10   of the elements that the state crime has or the state

11   crimes have, but not all of them because they are

12   different.  And we live in a country where we have federal

13   law and state law.  That's how the founders and Congress

14   have made these laws, and I don't see anything in 18,

15   3553(a)(2) that says that that's a factor the Court can

16   take into consideration.

17           He says he was attentive to his grandmother, his

18   friend who testified in open court today.  He was honest.

19   He returned his wallet.  Well, he was apparently attentive

20   to the victim's family and agreed to keep the little girl's

21   dog.

22           And then he says he was stoned.  And I know that

23   Mr. Rasmussen has clarified that by saying that he was not

24   really smoking at the time.  He was doing drugs at the

25   time.

1            And then there's factors on the other side of the

2    equation, and that is -- well, I should say, too, that

3    many, many people have family members who die, fathers who

4    die of cancer, including me when I was young, who have had

5    relationships with women that fell apart, and who have had

6    animals that died.  And lots of people in the normal

7    society live without criminal actions having had all those

8    experiences.  The defendant abused the trust the victim's

9    family had placed in him, and I think the victim's mother

10   made that perfectly clear.

11           The report says that he knew right from wrong,

12   but on page 6 of the report he says, "Mr. McBurnette stated

13   that no one was more surprised than he when he was arrested

14   for the charges than he was.  He woke up in jail and asked

15   himself why he was there, and then he remembered.  And he

16   said, 'No, not me,'" which goes back to his argument here

17   in open court today that it was a mistake.

18           Well, this Court does not believe it was a

19   mistake.  First of all, Mr. Fortune is correct in the way

20   he recounted the testimony that was given at trial with

21   respect to the preparation, the visits on various Web

22   sites, the showing of the adult pornography to the minor

23   child before he actually came to the production of the

24   videotape he was convicted for.  He is very bright.  His

25   mother has testified that he was very bright in school,

1    that he was bored.  Well, maybe he was bored that day, too.

2    I don't know.  But he was smart and he prepared it.  He

3    even prepared it to such an extent that while he was

4    showing her adult pornography, he had phony telephone

5    conversations with Direct TV that, oh, the TV was switching

6    channels automatically from a channel that a child would

7    watch to adult pornography.

8         And I think it has been pointed out that he

9    placed money on the floor, had two cameras, all in

10   preparation for what he was going to do and how he was

11   going to prevent the minor victim from talking.

12        And, finally, we are not just talking about

13   looking at the Internet.  We are talking about making a

14   videotape using a live little girl, having made

15   preparations for this in advance, and planning how to get

16   her to not tell.

17        And, finally, I want to say about recidivism, I

18   have read the report, and one thing that stuck out on page

19   14 in the report of the psychologist is that he has no

20   history of noncontact sexual interest or being convicted of

21   noncontact sexual behavior.  He did not offend against a

22   male child.  Offenders who have offended against male

23   children or male adults recidivate at a higher rate than

24   compared to those who do not have male victims, but it does

25   say that Mr. McBurnette did offend against a nonfamily

*64*

1    member which increases his recidivism rate.

2              I think the guidelines are appropriate.  I think

3    the Court has the authority to impose a sentence other than

4    that recommended by the advisory guidelines, but the Court

5    really can see no reason to depart from the sentence called

6    for by application of the guidelines in this case.  I know

7    that the law as handed down to us by the Supreme Court has

8    changed the guidelines from mandatory to advisory and even

9    most recently said they are not presumed reasonable, but I

10   have looked at all of this.  I heard the testimony at the

11   trial, and I think the guidelines are appropriate.

12             I think the guidelines are appropriate in this

13   case because of the nature and circumstance of this offense

14   and the history and characteristics of this defendant, and

15   I have outlined how it was planned, how those telephone

16   calls were made, how two cameras were used.  I think the

17   guideline sentence is an appropriate sentence to reflect

18   the seriousness of the offense, to provide just punishment

19   for the offense, and to promote respect for the law.  I

20   think the guideline sentence is appropriate to protect the

21   public from further crimes of the defendant, and I think

22   that is the most important factor in this case.  And I

23   think the guideline sentence is an appropriate sentence to

24   avoid unwarranted sentencing disparities among defendants.

25             And for those reasons pursuant to the Sentencing

1    Reform Act of 1984, it is the judgment of the Court that

2    the defendant, Martin Tracy McBurnette, is hereby committed

3    to the custody of the Bureau of Prisons to be imprisoned

4    for a term of 360 months.  The guideline range of

5    imprisonment would normally be life.  However, because the

6    guideline range exceeds the statutory maximum, the

7    statutory maximum becomes the guideline sentence pursuant

8    to United States Sentencing Guidelines 5G1.1(a), and I have

9    stated my reasons.

10           The forfeiture and restitution issue has been

11   resolved by the parties, but will be resolved by a separate

12   order.  The Court is not imposing a fine because I find

13   that the defendant does not have the ability to pay the

14   fine in addition to the forfeiture restitution subject

15   matter that has been worked out by the parties, but the

16   Court does order the defendant to pay the United States a

17   special assessment of $100 which is due immediately.

18           Upon release from imprisonment, the defendant is

19   placed on supervised release for the rest of his life.

20   That's a life term.  While on supervised release,

21   Mr. McBurnette, you shall comply with the standard

22   conditions of supervised release of record in this court.

23   It is your obligation to familiarize yourself with those.

24   And if you don't understand them, ask the probation officer

25   about them because ignorance of the rules will not excuse

*66*

1    you from complying with them.

2            There are some special conditions that I will now

3    read into the record:  First, due to your history of

4    substance abuse, you shall participate under the

5    administrative supervision of the probation officer in a

6    drug and alcohol intensive counseling and aftercare service

7    program conducted by the probation office or a comparable

8    program conducted in the district of supervision.

9            Two, you shall participate under the

10   administrative supervision of the probation office and the

11   probation officer's computer restriction monitoring program

12   or a comparable program in the district of supervision.

13           Three, you shall not have any unsupervised

14   one-to-one contact with any children under the age of 18

15   other than your own children, if there should be any.

16           Four, you shall not engage in any occupation,

17   employment, or volunteer activities which would place you

18   in a position with children under the age of 18.

19           Five, pursuant to the Adam Walsh Child Protection

20   Act of 2006, you shall register as a sex offender not later

21   than three business days from release if placed on

22   supervised release before sentencing or if placed on

23   probation, which obviously you will not.  You shall keep

24   the registration current in each jurisdiction in which you

25   reside or are employed.  You shall no later than three

*67*

1   business days after each change in name, residence,

2   employment, or student status appear in person in at least

3   one jurisdiction in which you are registered and inform

4   that jurisdiction of all changes in the information.  And

5   failure to do so may not only be a violation of this

6   condition but may also be a new federal offense punishable

7   by up to 10 years imprisonment.

8          Six, you shall allow the probation officer access

9   to any photographs and/or videorecording you may possess.

10          Seven, you being a felon and being required to

11   register under the Sex Offender Registration and

12   Notification Act shall submit your person and any property,

13   house, residence, vehicle, papers, computers, other

14   electronic communications, or data storage devices or media

15   and effects to search at any time with or without a warrant

16   by any law enforcement or probation officer with reasonable

17   suspicion concerning a violation as a condition of

18   supervised release or unlawful conduct by the person or by

19   any probation officer in the lawful discharge of the

20   officer's supervisory functions.

21          Finally, you are ordered to participate in an

22   approved mental-health treatment program specializing in

23   sex offender treatment under the administrative supervision

24   of the probation officer.  This program may include a

25   psychosexual evaluation, family, group, and/or individual

1   counseling and psychological and clinical polygraph

2   testing.  The results of the polygraph examinations may not

3   be used as evidence in court for the purpose of revocation

4   of this provision or may be considered in a hearing to

5   modify the conditions of release.  While participating in

6   treatment, you shall abide by all rules and requirements of

7   the program, and you shall contribute to the cost of the

8   treatment and polygraph testing unless the probation

9   officer determines that you do not have the ability to do

10  so.

11          And, finally, I would like to recommend that

12  while you serve this sentence that you also be allowed to

13  participate in mental-health treatment that may be offered

14  by the Bureau of Prisons for sex offenders.

15          Are there any objections from any party as to the

16  findings of facts, the calculations, the sentence, or the

17  manner in which the sentence was pronounced or imposed

18  other than those the Court has already dealt with and ruled

19  on?

20          MR. FORTUNE:  None from the Government, Your

21  Honor.

22          MR. RASMUSSEN:  No, Your Honor.

23          THE COURT:  Okay.  Mr. McBurnette, you have the

24  right to appeal this sentence imposed within 10 days if you

25  believe the sentence is in violation of law.  With a few

*69*

1    exceptions, any notice of appeal must be filed within

2    10 days of the judgment being entered in this case, which

3    is the day I sign it.  That will be more likely today or

4    tomorrow.  If you are unable to pay the cost, you may apply

5    for leave to appeal *in forma pauperis* and for appointment

6    of counsel.  And if you are allowed by the court to proceed

7    on appeal *in forma pauperis* upon your request, the clerk of

8    the court will assist you in preparing and filing a notice

9    of appeal.  He is remanded back in your custody.

10            (End of proceedings.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

        I hereby certify that the foregoing transcript
in the above-styled cause is true and accurate.

        Date:  6/08/09.


_____

**Leah S. Turner, CSR, RMR, CRR**
**Federal Official Court Reporter**

Certified Shorthand Reporter – 225 wpm
Registered Merit Reporter – 260 wpm
Certified Realtime Reporter